IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 7, 2010

**SHAKIR ADAMS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 08-05967     James M. Lammey, Jr., Judge**

**No. W2010-00217-CCA-R3-PC  - Filed March 1, 2011**

The petitioner, Shakir Adams, appeals the denial of his petition for post-conviction relief from his first degree premeditated murder conviction, arguing that he received the ineffective assistance of counsel.  Following our review, we affirm the post-conviction court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Magan N. White, Jackson, Tennessee (on appeal); and Cicely A. Dickerson, Bartlett, Tennessee (at hearing), for the appellant, Shakir Adams.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; William L. Gibbons, District Attorney General; and Kevin R. Rardin and Stacy M. McEndree, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted of first degree premeditated murder by a Shelby County Criminal Court jury and sentenced to life imprisonment.  This court affirmed his conviction and sentence on direct appeal, and the Tennessee Supreme Court denied permission to appeal.  See State v. Shakir Adams, No. W2006-02038-CCA-R3-CD, 2008 WL 1891451 (Tenn. Crim. App. Apr. 29, 2008), perm. to appeal denied (Tenn. Oct. 27, 2008).

On direct appeal, this court recounted the proof adduced at trial as follows:

Rovonda Green testified that she lived in the Warren Apartments in November of 1999. On the morning of November 7th, she was sitting on the balcony of an upstairs apartment with two other women and observed a group of men, including the [petitioner], talking together in the grassy area below. However, she was unable to hear what the men were discussing. Ms. Green stated that she was sitting on the apartment steps talking to her neighbors, Rosalyn Hardy and Lolar Stewart, when she heard gunshots. She then saw the [petitioner] running after the victim, shooting at him with a handgun. She recalled that she had seen the victim a few times but did not know him. Ms. Green testified that her initial reaction upon seeing the shooting was to get up and run inside Ms. Hardy's apartment. After the shooting, Ms. Green met with police officers and identified a photograph of the [petitioner] from a photographic array.

On cross-examination, Ms. Green testified that she had lived at the Warren Apartments for approximately three years prior to the incident. She stated that she did not know the [petitioner] personally, and did not believe she had ever spoken to him. She testified that the [petitioner] knew Lolar Stewart and stated that she had seen the [petitioner] coming out of Ms. Stewart's apartment on more than one occasion. Ms. Green reiterated that the [petitioner] had a gun, although she did not know what color or model of gun the [petitioner] possessed. Ms. Green admitted that she did not tell police officers that she saw the [petitioner] shooting at the victim in the statement she made after the shooting took place. However, she stated that she was shown a photographic array of suspects and identified the [petitioner] as the individual who ran past her firing a gun.

On re-direct examination, Ms. Green testified that she saw both the [petitioner] and the co-defendant, Tony Johnson, firing at the victim. She also testified on re-direct that the victim was unarmed. On re-cross examination, Ms. Green stated that before the shooting, the men walked off and out of her line of sight where she could not see them. Ms. Green admitted that in her statement to police, she said that she saw the co-defendant shooting at the victim, but did not mention that the [petitioner] was also shooting at the victim as well. She conceded that her difficulty recalling exactly who shot at the victim was the reason she did not indicate that she saw anyone other than the co-defendant shooting at the victim in her statement to police.

Elbony Baldwin testified that she lived at the Warren Apartments with her son when the shooting occurred. She stated that her cousin, a young man named Peewee, also lived at the apartment with her and her son at that time. She stated that she was familiar with the [petitioner] through Peewee and the [petitioner] visited her apartment regularly.

Ms. Baldwin stated that prior to the murder, she witnessed several men standing in a circle outside the apartments around one individual. She identified the [petitioner] as one of the men standing in the circle. She stated that the men were having an angry conversation, but she was unable to determine the subject of the conversation. She stated that as the group broke up, the [petitioner] went and said something to a man who had been standing in the middle of the circle. After speaking to him, the man walked into a house two doors away and the [petitioner] walked off. Ms. Baldwin stated that she went into her apartment and closed the door.

Ms. Baldwin testified that several minutes later, she left her apartment and went to the grocery store. She also testified that closer to the time of the shooting, she had returned from the grocery store and was in her apartment with Peewee putting away groceries. She stated that upon hearing gunshots, she went to the window and saw several people running past. She admitted that she did not know where the [petitioner] was when the shots were fired. Ms. Baldwin stated that she did not see the [petitioner] until the evening of the murder when he arrived at her apartment. Ms. Baldwin spoke with the [petitioner] who told her that "him and his folk, didn't give me no specific name, they shot this little dude. The young man." The [petitioner] told Ms. Baldwin that he shot the victim once and then his gun jammed, so his associates shot him two more times. After killing the victim, the [petitioner] and his "folk" jumped into a car and headed to his girlfriend's house in Whitehaven. The [petitioner] also told Ms. Baldwin that his conscience was not going to be bad and that he would "sleep like a king."

Ms. Baldwin testified that she saw the [petitioner] the next morning at the bus stop on her way to an appointment at the Department of Human Services (DHS). Ms. Baldwin asked the [petitioner] if he left the gun from the shooting in her apartment. The [petitioner] told her that he did not leave the gun in her apartment. After her appointment at DHS, Ms. Baldwin received a phone call informing her that she needed to return to her apartment because she was going to be evicted within three days. Peewee told her that the police had been to her apartment and found the gun in her couch.

Ms. Baldwin testified that she did not know whether the [petitioner] was a member of the Gangster Disciples, but she stated that Peewee was a member of that gang. She also stated that she did not know the identity of any of the other young men who were standing around the victim prior to the his death. Ms. Baldwin identified photographs taken of her living room, couch, and the gun found by police underneath the couch cushions. She testified that the gun belonged to the [petitioner]. She also stated that the [petitioner]'s use of the word "folk" when he told her about the murder on the night of the shooting was commonly used to refer to fellow gang members.

On cross-examination, Ms. Baldwin testified that she had lived at the Warren Apartments for approximately a month before the shooting. She stated that she had never dated the [petitioner]. She recounted that Peewee met the [petitioner] at the Clayborne Apartments before Peewee moved in with her at the Warren Apartments. She also stated that the initial confrontation between the victim and the circle of men lasted only about five or six minutes. Ms. Baldwin recalled that Peewee told her about the shooting before the [petitioner] arrived later that evening and told her that he shot the victim. The [petitioner]'s version of the story confirmed Peewee's story. After police searched her apartment, she went downtown to speak with detectives who had her call the [petitioner] and tell him to turn himself in to the authorities. The [petitioner] refused to turn himself in, stating that he would not do so until after his birthday on January 12, 2000. Ms. Baldwin provided detectives with the [petitioner]'s phone number. She also stated that she was not considered a suspect by police.

Lolar Stewart testified that she was outside her apartment visiting with Ms. Green and Ms. Hardy when she witnessed the murder. Ms. Stewart identified the [petitioner] as one of the men involved in a confrontation she had witnessed earlier that day. She stated that the [petitioner], co-defendant and several other men were speaking to the victim and asking him whether he knew anything about an individual named "Head" who had been shot. The victim went over to a neighboring apartment to call his cousin while the other men stood around. According to Ms. Stewart, after the victim called his cousin and returned outside, one of the men in the group called the victim's name and punched the victim in the face. The victim took off running, and the men followed after him, running and shooting. Ms. Stewart saw the [petitioner] with a handgun. Ms. Stewart testified that when the men started shooting, she got up and ran into her apartment. After waiting inside for a period of time, she walked outside and around the corner where she saw the

victim lying dead on the ground.

Ms. Stewart testified that she knew the [petitioner] fairly well, and she had seen him with a gun on more than one occasion. Ms. Stewart acknowledged that the [petitioner] used to come to her apartment regularly and that they had dated. Ms. Stewart stated that the [petitioner] was a member of the Gangster Disciples, and her knowledge of that fact was based on the [petitioner]'s use of gang signs, handshakes, and his manner of talking. During an interview with police, Ms. Stewart identified the [petitioner] from a photographic array. Ms. Stewart also identified photographs of the [petitioner]'s coat and handgun which were located in Ms. Green's apartment. Ms. Stewart further identified the statement she gave to police in which she said that she saw the [petitioner] shoot the victim.

On cross-examination, Ms. Stewart testified that while she was talking to Ms. Green and Ms. Hardy, their attention was drawn to the confrontation that the men were having with the victim. She stated that she did not discuss the shooting with the other two women after it occurred. She described the gun used by the [petitioner] as a black and silver gun. When shown a photograph of the handgun, she acknowledged that the gun in the photograph was almost all black, with little or no silver coloring in it. She also acknowledged that before the [petitioner] joined the men in the circle, and before she joined the other two women on the steps, she and the [petitioner] had been in her apartment. Ms. Stewart testified that she saw the [petitioner] at the Warren Apartments almost every day. She stated that when she was initially questioned by police, she said that she did not know anything about the shooting. However, she said that she made her statement to police after they threatened to remove her children from her home.

Tennial Ward testified that she was visiting her sister in her apartment when the victim stopped by to use the telephone. She stated that she had seen the victim a couple of times around the apartment complex prior to the shooting. After the victim finished his telephone call, he went back outside and was confronted by at least six men. Ms. Ward stated that she opened the back door of the apartment and saw the victim talking to the men who stood in a loose circle around him. The men left soon thereafter and Ms. Ward went back inside and closed her door. Five to ten minutes later, Ms. Ward heard several gunshots. She stated that she got her children down on the floor and called the police. Ms. Ward stated that she did not know if any of the men who confronted the victim were members of a gang.

Officer Kevin Shaver testified that he worked as a police officer with the Crime Scene Investigation Bureau of the Memphis Police Department. He stated that he helped process the crime scene. He testified that he recovered five spent nine-millimeter shell casings, and one live nine-millimeter bullet at the crime scene. Officer Shaver testified that the nine-millimeter shell casings were manufactured by R-P Ammunition.

Officer Ricky Davidson testified that he worked as a police officer with the Crime Scene Investigation Bureau of the Memphis Police Department. He stated that the day after the shooting, he went to Ms. Green's apartment to photograph and collect the gun found in her couch. At the scene, Officer Davidson photographed and tagged a nine-millimeter handgun. Officer Davidson was able to further identify the handgun model as a Jennings Nine manufactured by Bryco Arms. Officer Davidson stated that the gun contained a magazine loaded with five live rounds manufactured by R-P Ammunition. Officer Davidson also stated that he was unable to obtain any usable fingerprints from the handgun.

Dr. O.C. Smith, a forensic pathologist, testified that he performed an autopsy on the victim and concluded that he died as a result of multiple gunshot wounds. Dr. Smith located three wound tracks in the victim's body. Dr. Smith testified that the most significant injury occurred as a result of a bullet that entered the victim's body through the "back of the shoulder and proceeded through to the front and right side of the body[,] going through the top of the left lung, injuring the subclavian artery and vein near the collarbone, and hitting the left common carotid artery." The bullet exited through the windpipe. Another bullet entered the victim's body through the thigh, striking a bone, fracturing it into multiple fragments, and lodging in the back of the thigh. A third bullet passed through the victim's bicep in one arm.

Special Agent and Forensic Scientist Steve Scott of the Tennessee Bureau of Investigation testified that he worked at the crime laboratory in Nashville where he was assigned to the Firearms Identification Unit. He testified that he performed several tests on the nine-millimeter handgun recovered from the crime scene. He identified the gun as a Jennings Nine manufactured by Bryco Arms, and stated that it was in operating condition with functioning safety features. He also testified that a bullet recovered from the victim possessed the same or similar characteristics as a bullet fired from the gun. However, the similarities were not sufficient for more conclusive identification. Agent Scott was able to conclusively identify the five spent

shell casings recovered by Officers Shaver and Davidson at the crime scene as having been fired from the [petitioner]'s gun.

Id. at *1-4 (footnote omitted).

On February 3, 2009, the petitioner filed a *pro se* petition for post-conviction relief, and following the appointment of counsel, an amended petition was filed on July 2, 2009. The post-conviction court conducted an evidentiary hearing over the course of three days in September and October 2009.

At the hearing, the petitioner's original trial counsel testified that he was retained by the petitioner's father in the summer of 2000 to represent the petitioner on his first degree murder charge. He said that he would have reviewed everything that was in the discovery given to him by the State, and he acknowledged that he filed a motion to suppress illegally obtained evidence. He also acknowledged that the case was reset twenty-five times during the course of his representation, but he could not recall the exact circumstances of each instance. He identified a letter written by him to the Board of Professional Responsibility in which he relayed that the State had sought two continuances on the trial date and that he had objected to one of those instances. However, original counsel was unable to recall anything specifically related to the case.

Original counsel withdrew from representation in March 2003 and stopped practicing law for personal reasons, which led to the suspension of his license. As a result of his suspension, original counsel was required to pay restitution to three clients, including the petitioner. Original counsel admitted that he was arrested and found in contempt of court for failing to appear at the petitioner's trial. During the two days he spent in jail, someone left a note on his bed of a drawing of a sword, which the sheriff's department characterized as a threat. Shortly thereafter, a newspaper article regarding the incident was published in The Commercial Appeal, which included quotations from the trial judge indicating why he released original counsel from jail.

Trial counsel testified that he was appointed to represent the petitioner in 2005 because the interim counsel had a conflict. At that time, trial counsel had been practicing law for approximately six years and had tried two capital cases. The petitioner had been in jail four years at that point. Trial counsel reviewed the petitioner's file and contacted the investigator who had been working on the case. He also obtained the transcript from the trial of the co-defendant, Tony Johnson, which he used to impeach one or two of the witnesses at the petitioner's trial.

Trial counsel testified that he did not file a motion to dismiss based on a violation of the right to a speedy trial because his research showed that many of the requests for continuances were attributable to the petitioner. Trial counsel could not find any evidence of prejudice with regard to any of the witnesses attributable to the delays. Trial counsel was concerned about the testimony of two female witnesses, Lolar Stewart and Elbony Baldwin, because they provided favorable information at one time but were "a little shaky" and testified unfavorably to the petitioner at Tony Johnson's trial. Counsel attempted to contact the two women, but they refused to talk to him.

Trial counsel testified that he did not challenge the admissibility of the gun found in Elbony Baldwin's apartment as having been seized without a warrant because the officers were given consent to search the apartment. Trial counsel recalled that in a previous statement, Tony Johnson had maintained that he was shooting with a .380 firearm, that his gun jammed, and that he stopped to clear it. However, no casings for a .380 were recovered from the scene; only casings from a nine millimeter were discovered. Therefore, trial counsel attempted to argue at trial that Johnson had been firing a nine-millimeter and only admitted to shooting a .380 to evade conviction. He recalled that the witnesses only saw Tony Johnson shooting even though they saw the petitioner with a gun.

Trial counsel testified that he filed a motion to continue a few weeks before trial based on a newspaper article about the arrest of the petitioner's original counsel, and the comments attributed to the trial court that original counsel had to be released from jail because the petitioner "is a gangster disciple who is going to kill him." Counsel was concerned that the court had in essence commented on the proof and that the jury pool would be unfairly prejudiced. Counsel sought a continuance so the story would fade from potential jurors' minds before the trial. However, he did not think that there was a legitimate basis for a motion for recusal because he did not see the trial court's comments as a reflection of its belief of the petitioner's guilt or innocence. At the petitioner's trial, counsel did not object to Lolar Stewart's testimony that she had seen the petitioner carry a gun because he believed the question was an appropriate "foundational" question.

Trial counsel testified that Tony Johnson had supposedly written an affidavit stating that he wrongly told the police that the petitioner was involved in the crime, but Johnson had never signed the affidavit. Trial counsel talked to Johnson, but Johnson told him that his appeal was pending and that he would not "get on the stand and say anything to this effect" or sign the affidavit.

Co-defendant Tony Johnson testified that he wrote an affidavit in 2001 in which he stated that in his original statement to police, he had falsely accused the petitioner of participating in the crime. He did not sign or date the affidavit, and he was not sure why he

did not. It was his intention to testify in court that the petitioner did not shoot the victim, and he made trial counsel aware of his intention. However, he was not called to testify. Johnson claimed that his appeals had concluded when he met with trial counsel to discuss the affidavit, and he never told counsel that he could not be helpful to the petitioner. Johnson said that no handwriting exemplars were ever taken from him, nor was any handwriting analysis conducted. Johnson never filed a petition for post-conviction relief.

The petitioner testified that he was in jail about six years before reaching trial. Besides original counsel and trial counsel, two other attorneys worked on his case. He recalled that original counsel abandoned his case on the day it was supposed to go to trial, and his father filed a complaint against original counsel with the Board of Professional Responsibility.

The petitioner testified that trial counsel represented him for two years before his trial. He said that trial counsel only visited him in jail on three occasions and never discussed defense strategies with him. He said that he was never offered a plea bargain, but on cross-examination, he acknowledged that he was not aware that first degree murder was a "no-deals" offense. He did not realize that it was against the law for it to take so long for him to go to trial. The petitioner stated that very few of the case continuances were attributed to the State. The petitioner said that Johnson was not called to the stand so he could invoke his right against self-incrimination.

The post-conviction court entered a written ordering denying the petitioner post-conviction relief. The court found, generally, that the petitioner failed to prove his claims by clear and convincing evidence and that his allegations were without merit.

## ANALYSIS

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

The petitioner argues that he received the ineffective assistance of counsel with regard to the violation of his right to a speedy trial, the failure to file a motion for recusal of the trial judge, the failure to call Tony Johnson to testify at trial or introduce Johnson's statement, and the failure to object to bad act evidence elicited by the State from Lolar Stewart.

## I. Speedy Trial

The petitioner argues that original counsel was ineffective in abandoning the petitioner's case, and trial counsel was ineffective in failing to file a motion to dismiss due

-10-

to the violation of his right to a speedy trial. He asserts that he was prejudiced by these deficiencies because two witnesses, Lolar Stewart and Elbony Baldwin, would have testified in his favor but "as time passed, they changed their testimonies and implicated [the petitioner] in the shooting."

At the evidentiary hearing, trial counsel testified that he did not believe that he had any basis to file a motion to dismiss based on a violation of the right to a speedy trial because his research showed that many of the requests for continuances were attributable to the petitioner. He said that he also could not find any evidence of prejudice with regard to any of the witnesses attributable to the delays. The post-conviction court did not directly address this issue in its order but found that the petitioner failed to show any prejudice regarding his claim against original counsel.

The Sixth Amendment to the United States Constitution and article 1, section 9 of the Tennessee Constitution guarantee the accused the right to a speedy and public trial. In determining whether the petitioner's right to a speedy trial was violated by the delay in this case, we must consider the following four factors: (1) the length of the delay; (2) the reason for the delay; (3) the petitioner's assertion of the right; and (4) the prejudice caused to the petitioner by the delay. See State v. Bishop, 493 S.W.2d 81, 83-84 (Tenn. 1973) (citing Barker v. Wingo, 407 U.S. 514 (1972)).

As to the first factor, certainly a six-year delay would be considered sufficient to trigger further inquiry. See State v. Utley, 956 S.W.2d 489, 494 (Tenn. 1997) (stating that the delay must approach one year to trigger the Barker v. Wingo analysis). However, the remaining factors weigh in favor of the State. The proof at the evidentiary hearing established that the majority of the continuances were requested by the petitioner's various attorneys and that the petitioner never asserted his right to a speedy trial.

Most importantly, there is also no proof of prejudice, "the single most important factor in the balancing test," see State v. Baker, 614 S.W.2d 352, 356 (Tenn. 1981), due to the delay. The testimony at the evidentiary hearing established that Stewart and Baldwin may have had favorable information at one time; however, that information was never brought to light and neither woman testified at the hearing as to whether her testimony had changed and, if so, how and why. This court can only speculate as to what the women would have testified, which does not rise to the level of clear and convincing proof. The petitioner has failed to prove that he was prejudiced by original counsel's "abandonment" of his case or trial counsel's failure to file a motion to dismiss.

## II. Recusal

The petitioner argues that trial counsel was ineffective in failing to file a motion for recusal of the trial judge due to the judge's comments published in a Commercial Appeal article about the petitioner.

The article relayed that original counsel had been jailed for contempt due to his failure to appear for the petitioner's trial approximately three years earlier. The article said that original counsel was in the same jail with the petitioner, whom the police identified as a gang member, and that original counsel had "skipped out on him with thousands of dollars in fees." The trial judge was quoted as saying, "'The Gangster Disciples now know he's in jail . . . . He needs to get out.'"

At the evidentiary hearing, trial counsel testified that he did not file a motion for recusal and that he was not sure that such motion would have been proper. He felt that the trial judge's remarks were more of a comment on the petitioner's background, than a reflection of his belief in the petitioner's guilt or innocence. The post-conviction court did not directly address the issue in its order, but given that resolution of this issue does not require a credibility determination, we will address it *de novo*.

Our supreme court has held that a trial judge should grant a recusal motion when he or she "has any doubt as to his or her ability to preside impartially in the case or when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." Bean v. Bailey, 280 S.W.3d 798, 805 (Tenn. 2009) (internal quotations and citations omitted). "[T]he test for recusal is an objective one because the appearance of bias is just as injurious to the integrity of the courts as actual bias." State v. Cannon, 254 S.W.3d 287, 307 (Tenn. 2008). "[W]hen a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality," the appearance of bias is enough to trigger a judge's recusal. Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994).

In the newspaper article in question, the trial judge made no expression regarding his belief in the petitioner's guilt or innocence or the merits of the case. The court acknowledged that original counsel might be in jeopardy from gang members incarcerated and awaiting trial, given his failure to complete his representation of the petitioner despite having been paid. The original link between the petitioner and a gang was attributed to the police, not the trial judge. In context and in its entirety, we cannot conclude that any reasonable person would view the trial judge's remarks as a bias against the petitioner instead of simply an explanation as to why original counsel was released from jail.

## III. Co-Defendant Tony Johnson

The petitioner argues that trial counsel was ineffective in failing to call co-defendant Tony Johnson as a witness at his trial. Johnson had previously given a statement to law enforcement in which he admitted that he and the petitioner shot at the victim, but he was unsure whether he actually hit him. He said that they were shooting at the victim as the victim was running away, but his firearm jammed and he stopped shooting. As he was clearing his gun, he saw the petitioner stand over the victim and shoot him two times. He said that he was armed with a .380 firearm, and the petitioner was armed with a nine-millimeter firearm.

Sometime in 2001, according to Johnson, he made a handwritten affidavit exculpating the petitioner. The unsigned, undated affidavit stated:

> On the above time in [sic] date 12-9-99 2:15 am I made a very untrue statement on [the petitioner]. I place[d] him into a homicide which he had no knowledge of. I'm sorr[y] for putting this court through so much trouble d[ue] to my wrong doing. So I'm asking the courts to release [the petitioner] cause he didn't have any knowledge of the homicide which occurred on 11-07-99.

At the evidentiary hearing, Johnson testified that he would have testified at the petitioner's trial that the petitioner did not shoot the victim, but he was not called to testify. He would have testified that he originally implicated the petitioner "to make it look like that he [was] the one who did it when actually it was me." Trial counsel testified that he did not call Johnson to testify because Johnson told him that he would not testify or sign the affidavit because his appeal was pending. Johnson contradicted trial counsel's testimony, stating that his appeals had ended and that he had been transferred to the Shelby County Jail from Whiteville Correctional Facility for the purpose of testifying but was never called.

The post-conviction court found that counsel's conduct fell "'within the wide range of professional assistance'" regarding the issue of Tony Johnson's affidavit and the matter of alibi witnesses. The court found that the credibility and reliability of Johnson's statement were "lacking because it was not properly signed or dated, nor was a handwriting analysis ever performed." The court said that the statement would have likely not been admissible at trial because Johnson did not take responsibility for the homicide; therefore, it would not qualify as a statement against penal interest for purposes of the rule against hearsay.

The petitioner asserts that Johnson wanted to testify at his trial but was never called. He alleges that trial counsel's explanation that Johnson refused to testify because his appeal

was pending cannot stand because Johnson's appeal had concluded at the time of the petitioner's trial. The post-conviction court accredited counsel's testimony, and we will not revisit that determination. We note that even if Johnson's direct appeal had concluded, he was not precluded from seeking other relief.

The petitioner also focuses his argument on whether the affidavit would have been admissible as a statement against penal interest pursuant to Tennessee Rule of Evidence 804(b)(3) in the event Johnson did not testify. Initially, however, the petitioner never showed that the affidavit could have been properly authenticated pursuant to Tennessee Rule of Evidence 901 as having been written by Johnson. He called no handwriting experts at the post-conviction hearing to establish that trial counsel could have authenticated the affidavit. The post-conviction court was particularly concerned with the credibility and reliability of the affidavit in that it was not signed or dated, or had a handwriting analysis performed. There is nothing in the record to show that counsel could have even established the right to have the affidavit admitted into evidence. Moreover, it is questionable whether the affidavit would have been admissible as a statement against interest, see Tenn. R. Evid. 804(b)(3), because Johnson did not directly take responsibility for the homicide in the affidavit.

The petitioner asserts that Johnson's statement would have been admissible pursuant to State v. Brown, 29 S.W.3d 427, 433-434 (Tenn. 2000), which held that the right to present a defense trumps the rule against hearsay in certain situations. Factors to consider in determining whether the exclusion of evidence violates the right to present a defense include whether (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important. Id. at 434 (citing Chambers v. Mississippi, 410 U.S. 284, 298-301 (1973)).

In the present case, there was no proof that the handwritten, unsigned, and undated affidavit could have even been authenticated in the first place, and the interest of excluding unreliable evidence is substantially important. Moreover, in that three witnesses saw the petitioner participate in the shooting and testified to such, it can hardly be said that any unreliable, unauthenticated hearsay evidence from a co-defendant would be critical to the defense.

In sum, we cannot conclude that counsel rendered ineffective assistance with regard to Tony Johnson's affidavit.

## IV. Bad Act Evidence

The petitioner lastly argues that trial counsel was ineffective in failing to object, under Tennessee Rule of Evidence 404(b), to the "bad act" evidence introduced in Lolar Stewart's testimony that she had seen the petitioner possessing a gun on other occasions. As to this issue, the post-conviction court found that the petitioner failed to offer sufficient proof on the issue and that trial counsel's decision whether to object was "a strategic decision this court will not second guess."

We note that the petitioner failed to conduct a 404(b) hearing at his post-conviction evidentiary hearing; therefore, any assertion that Stewart's statement could have been properly excluded as a prior bad act does not clearly and convincingly establish deficient performance on the part of trial counsel. Moreover, we fail to see how testimony that the petitioner possessed a gun on other occasions could have affected the jury's verdict because three witnesses testified that they saw the petitioner involved in the shooting.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court denying the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE